PETER A. WALKER, ESQ. (PW-7984)
CHRISTOPHER H. LOWE, ESQ. (CL-0218)
JACQUELYN G. HOLSCHER, ESQ. (JH-4168)
SEYFARTH SHAW LLP
1270 Avenue of the Americas, Suite 2500
New York, New York 10020-1801
(212) 218-5500
(212) 218-5526

Attorneys for Defendant
  The Stop & Shop Supermarket Company LLC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- x
LAWRENCE T. CREHAN,                   :      **E-FILED**
                                      :
        Plaintiff,                    :      Case No.: 05-CV-8759 (LAK)
                                      :
    v.                                :
                                      :
THE STOP & SHOP SUPERMARKET           :      **RULE 56.1**
COMPANY,                              :      **STATEMENT OF UNDISPUTED FACTS**
                                      :
        Defendant.                    :
                                      :
------------------------------------- x
------------------------------------- x
                                      :
THE STOP & SHOP SUPERMARKET           :
COMPANY LLC,                          :
                                      :
        Defendant and Third-Party Plaintiff, :
                                      :
    v.                                :
                                      :
UNITED FOOD AND COMMERCIAL            :
WORKERS, LOCAL 1500 WELFARE FUND, and :
UNITED FOOD AND COMMERCIAL            :
WORKERS NATIONAL HEALTH AND           :
WELFARE FUND,                         :
                                      :
        Third-Party Defendants.       :
------------------------------------- x

NY1 26431889.9 / 24253-000114

**DEFENDANT THE STOP & SHOP SUPERMARKET COMPANY LLC'S**
**LOCAL CIVIL RULE 56.1 STATEMENT OF UNDISPUTED FACTS**

Pursuant to Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York, defendant The Stop & Shop Supermarket Company LLC ("Stop & Shop"), incorrectly named as The Stop & Shop Supermarket Company, respectfully submits this statement of material facts as to which it contends there is no genuine material issue to be tried.[1]

**I.    The Parties**

1.    Stop & Shop operates more than 350 grocery stores throughout New England, New York and New Jersey.  These stores are divided into three divisions:  the Boston Division, the Connecticut Division and the New York Metro Division.  (Declaration of John Hicks, dated September 12, 2006 ("Hicks Decl.") ¶ 2.).

2.    Plaintiff Lawrence T. Crehan ("Plaintiff") was employed by Stop & Stop from on or about December 5, 1999 until on or about March 2, 2005, during which time he held various union and non-union positions in six different stores in Massachusetts and Brooklyn, New York. (Verified Complaint and Amended Complaint (collectively, "Compl.") ¶¶ 11-13, annexed as Exhibit A to Walker Decl.; Transcript of the Deposition of Lawrence T. Crehan ("Crehan Dep. Tr.") 34:19-35:4, 39:24-42:17, 50:7-56:4, 63:8-66:4, 69:4-71:19, 89:17-22 (the transcript of Crehan's deposition and exhibits marked at Crehan's deposition are annexed as Exhibit B to Walker Decl.).

---

[1] The undisputed facts set forth herein are followed by citations to their support in the record. Copies of all pleadings, deposition testimony and deposition exhibits cited herein are annexed to the accompanying Declaration of Peter Walker, dated September 12, 2006 ("Walker Decl."). References to deposition transcripts are cited herein as "page:line."

2

3.      Third-Party Defendant United Food and Commercial Workers ("UFCW"), Local 1500 Welfare Fund (the "Fund") is a Welfare Fund that maintains and administers the UFCW Local 1500 Full Time Employees Group Benefit Plan ("the Plan").  (Hicks Decl., Ex. A at 33-36, Ex. B).

## II.     Nature Of Plaintiff's Complaint

4.      On October 17, 2005, Plaintiff filed a Complaint against Stop & Shop alleging that he was retaliated against for his participation in another action against Stop & Shop entitled Glen Jacobsen v. The Stop & Shop Supermarket Company, 02-CV-5915, United States District Court, Southern District of New York (the "Jacobsen action"), a collective action arising under the Fair Labor Standards Act ("FLSA"). (Compl. *passim*).

5.      The Jacobsen action was filed on July 25, 2002 and Plaintiff filed his consent to join that action on July 9, 2003. (Walker Decl., Ex. C at Dkt. Entry Nos. 1, 105; Crehan Dep. Tr. Ex.1).

6.      The Jacobsen action was brought by certain employees of Stop & Shop's General Merchandise ("GM") Department alleging violations of the FLSA's overtime compensation requirements. (Compl. ¶ 14).

7.      Plaintiff began his employment with Stop & Shop on December 5, 1999 as a part-time Night Crew Clerk. (Crehan Dep. Tr. 34:19-20, 35:20-36:12).

8.      Plaintiff was employed in Stop & Shop's GM Department in Malden, Massachusetts from September 2000 through October 2001 as a General Merchandise Manager Trainee and a General Merchandise Reserve Manager, both of which are non-union positions. (Compl. ¶ 12; Crehan Dep. Tr. 51:5-9).

3

9. In October 2001, Plaintiff voluntarily requested and was granted a reassignment to a union position, and Stop & Shop transferred him to a store in Peabody, Massachusetts as a Night Crew Clerk. (Crehan Dep. Tr. 50:7-52:9, 55:18-56:4).

10. Thereafter, Plaintiff remained a union employee and was employed in various Massachusetts stores until May 2003, at which time his request to relocate to the New York Metro Division was granted and he was assigned to Stop & Shop Store #505 in Brooklyn, New York. (Crehan Dep. Tr. 63:8-66:4, 69:4-13, 71:8-72:11).

11. Plaintiff and Stop & Shop settled the Jacobsen dispute, without any admission of liability on the part of Stop & Shop, effective on January 1, 2004. (Compl. ¶ 15).

### III. Plaintiff's Supervisors Were Not Aware Of His Participation In The *Jacobsen* Action

12. John Hicks ("Hicks") was employed as the District Manager of District #44, which includes both Stores #505 and #506 in Brooklyn, New York, from April 2001 through March 2005, including the entire time that Plaintiff was employed in the New York Metro Division of Stop & Shop. (Hicks Decl. ¶ 3; Transcript of the Deposition of John Hicks ("Hicks Dep. Tr.") 31:6-9 (the relevant portions of the transcript of Hicks' deposition and exhibits marked at Hicks' deposition is annexed as Exhibit D to Walker Decl.).

13. William McCullough ("McCullough") was employed as the Manager of Store #505 in Brooklyn, New York from June 2001 through September 2004. McCullough was the Manager of Store #505 and Plaintiff's direct supervisor throughout the entire time that Plaintiff worked in Store #505. (Hicks Decl. ¶ 4).

14. Ronald Showalter ("Showalter") was employed as the Manager of Store #506 in Brooklyn, New York from April 2004 through February 2006. Showalter was the Manager of Store #506 throughout the entire time that Plaintiff worked in Store #506. (Transcript of the

Deposition of Ronald Showalter ("Showalter Dep. Tr.") 11:15-23 (the relevant portions of the transcript of Showalter's deposition is annexed as Exhibit E to Walker Decl.); Compl. ¶ 11, 15-16).

15. On June 9, 2003, Stop & Shop sent a confidential memorandum to all Vice-Presidents of Operations, Marketing Managers, District Managers and Associate Relations Specialists notifying them of the Jacobsen action and instructing them on how to respond if they received any questions about the lawsuit from Stop & Shop employees. (Hicks Dep. Tr., Dep. Ex. 11).

16. The above-referenced confidential memorandum did not identify any of the participants in the lawsuit, other than named plaintiff Glen Jacobsen. (Id.).

17. The above-referenced confidential memorandum expressly stated that "[t]he Company will not tolerate retaliation, or any other sort of differential treatment, against any associate who chooses to join the lawsuit." (Id. at 2).

18. The above-referenced confidential memorandum was sent as a follow-up to a conference call held by Stop & Shop for the purpose of notifying District and Store managers of the Jacobsen action. During the conference call, the managers were specifically directed not to ask employees about the lawsuit or retaliate in any way against any employee whether or not they chose to participate in the lawsuit. Stop & Shop did not identify any of the plaintiffs in the Jacobsen action to Hicks, McCullough or Showalter during this call or at any other time, other than the named plaintiff, Glen Jacobsen. (Hicks Decl. ¶ 12).

19. Plaintiff admits that he never discussed his participation in the Jacobsen action with Hicks, McCullough, Showalter, or anyone else in the New York Metro Division of Stop & Shop. (Crehan Dep. Tr. 113:10-22, 127:14-18; 159:7-10).

20. Plaintiff admits that he never was present for or was aware of any discussion, whether written or verbal, between Hicks and McCullough regarding Plaintiff's participation in the Jacobsen action. (Crehan Dep. Tr. 134:18-136:13).

21. Hicks also never discussed the Jacobsen lawsuit with Showalter. (Showalter Dep. Tr. 161:17-19).

22. Plaintiff admits that he has no evidence that Hicks or McCullough told Showalter about Plaintiff's participation in the Jacobsen action, other than his assumption that they did so. (Crehan Dep. Tr. 162:3-163:19).

23. There is no evidence that Hicks, McCullough, Showalter, or any other Stop & Shop manager read either of the supposed articles in the Boston Globe or New York times discussing the Jacobsen action. (Crehan Dep. Tr. 137:20-138:12, 159:11-22).

24. Plaintiff admits that his name was not identified in either of the supposed newspaper articles discussing the Jacobsen action. (Crehan Dep. Tr. 140:10-140:21).

25. Plaintiff himself admits that he does not know which GM employees at Stop & Shop participated in the Jacobsen action. (Crehan Dep. Tr. 140:22-141:2).

26. Hicks does not know whether any GM personnel from District 44 joined the Jacobsen action. (Hicks Dep. Tr. 193:13-16).

27. Of the seven hundred (700) GM employees eligible to participate in the Jacobsen action, only two hundred (200) ultimately consented to join the lawsuit as party plaintiffs. (Walker Decl., Ex. F at 4-5).

28. Neither Hicks nor McCullough were ever aware that Plaintiff was a participant in the Jacobsen action prior to Plaintiff's termination from Stop & Shop. (Hicks Dep. Tr. 202:16-

6

24; Transcript of the Deposition of William McCullough ("McCullough Dep. Tr.") 213:20-214:3 (the transcript of McCullough's deposition is annexed as Exhibit G to Walker Decl.).

29. There is no evidence in the undisputed record that Showalter was ever aware that Plaintiff was a participant in the Jacobsen action prior to Plaintiff's termination from Stop & Shop. (Crehan Dep. Tr. 159:7-22; Showalter Dep. Tr. 161:17-19).

30. Hicks did not research Plaintiff's employment background or review any of his employment files when he was transferred into District #44 from Massachusetts. (Hicks Dep. Tr. 194:20-195:13, 198:12-15).

31. On January 1, 2004, Stop & Shop settled the Jacobsen action with Plaintiff without any admission of liability. (Compl. ¶ 15).

32. On or about June 8, 2004, Stop & Shop issued a settlement check to Plaintiff in connection with the January 1, 2004 settlement of the Jacobsen action. (Compl. ¶ 15; Crehan Dep. Tr., Dep. Ex. 3).

33. Plaintiff's settlement check was sent to Store #505 in the exact same kind of perforated envelope in which his payroll checks are issued. The perforated envelope was still sealed when Plaintiff received the check. (Crehan Dep. Tr. 114:13-15, 141:15-142:16).

34. Plaintiff told McCullough and the payroll manager at Store #505 that he received a second check because "[s]ome store in Boston owed [him] a week's vacation." (Crehan Dep. Tr. 114:11-117:3).

35. Plaintiff admits that he does not know whether McCullough or the payroll manager ever contacted anyone at Stop & Shop to inquire further about why Plaintiff received a second check. (Crehan Dep. Tr. 122:2-17).

36. The payroll distribution reports received by Store #505 only show when an employee has received a payroll check charged to Store #505's budget, and do not indicate the dollar amounts of such checks. (McCullough Dep. Tr. 172:10-173:19).

37. McCullough testified that employees do receive more than one check at times for back pay owed and other reasons. (McCullough Dep. Tr. 174:15-20).

38. Plaintiff admits that he never told McCullough or the payroll manager at Store #505 that the check he received at Store #505 was in connection with the settlement of the Jacobsen action. (Crehan Dep. Tr. 123:12-124:3).

39. Hicks never knew that Plaintiff received a settlement check from Stop & Shop. (Hicks Dep. Tr. 204:14-17).

40. McCullough never knew that Plaintiff received a settlement check from Stop & Shop. (McCullough Dep. Tr. 170:5-8).

## IV. Plaintiff's Transfer To Store #506 Was Not A Materially Adverse Change In The Terms And Conditions Of His Employment

41. The collective bargaining agreement between Stop & Shop and the Union expressly provides that management has the right to transfer employees from one store location to another. (Hicks Decl., Ex. A at 30).

42. Employee transfers are common practice at Stop & Shop. (Showalter Dep. Tr. 53:23-24; McCullough Dep. Tr. 180:7-16).

43. Plaintiff admits to having an understanding that Stop & Shop transfers employees between stores. (Crehan Dep. Tr. 56:21-24, 60:22-25, 62:13-16, 68:4-69:3).

44. McCullough and Showalter did not have authority to transfer employees between stores. (Showalter Dep. Tr. 157:16-20; McCullough Dep. Tr. 105:5-17, 170:9-13).

8

45. As a District Manager, Hicks had the authority to transfer employees between stores. (Hicks Dep. Tr. 196:4-10).

46. Hicks often transferred employees, both union clerks and non-union managers, from one store to another when additional assistance was needed in another store. (Hicks Dep. Tr. 153:18-154:19, 176:7-19).

47. Prior to relocating to the New York Metro Division and joining the <u>Jacobsen</u> action, Plaintiff himself had been involuntarily transferred to four different Stop & Shop stores in four separate cities in Massachusetts, with each transfer requiring a change in Plaintiff's title, position, commute, store volume, and/or store condition. (Crehan Dep. Tr. 39:24-42:17, 50:7-56:4, 63:8-66:4).

48. Plaintiff admits that he did not voluntarily request any of these transfers or have the option of selecting the store to which he would be transferred. Rather, he was simply told by management when and where he was to be transferred. (Crehan Dep. Tr. 42:12-17; 56:19-20, 63:15-18, 66:22-67:6).

49. Plaintiff's transfer from Store #32 in Beverly, Massachusetts, where he resided, to Store #62 in Malden, Massachusetts required a longer commute of approximately a 45-minute drive. (Crehan Dep. Tr. 41:18-42:6).

50. Plaintiff admits that his transfer from Peabody, Massachusetts to Gloucester, Massachusetts involved a transfer to a lower volume store. (Crehan. Dep. Tr. 64:22-65:11).

51. Plaintiff admits that when he transferred from Store #32 in Beverly, Massachusetts to Store #505 in Brooklyn, NY, he transferred to a store that was much older, more urban, busier, more congested, had more foot traffic and was not as clean. (Crehan Dep. Tr. 75:19-79:4).

9

52.     Plaintiff transferred to Brooklyn, New York at his own request to be closer to his mother and children, and was assigned to Store #505 as a Full-Time Dairy Clerk.  (Crehan Dep. Tr. 9:7-20, 79:5-8).

53.     While Plaintiff worked in Store #505, he assisted in all departments, including grocery, dairy, receiving and frozen food.  As a full-time clerk, he could be assigned to any of those departments at the discretion of management.  (McCullough Dep. Tr. 160:5-161:2).

54.     In October or November 2003, after Plaintiff joined the Jacobsen action, McCullough asked Plaintiff for his assistance in implementing the new Computer-Assisted Ordering ("CAO") system, an ordering system with which Plaintiff had familiarity from his prior employment with Stop & Shop in Massachusetts.  In connection with this new role, McCullough appointed Plaintiff the captain of the CAO team. (Crehan Dep. Tr. 79:20-81:2).

55.     Plaintiff continued to assist as captain of the CAO team until June 2004.  (Crehan Dep. Tr. 83:12-84:18).

56.     Plaintiff admits that his relationship with McCullough remained professional and businesslike throughout his employment at Store #505.  (Crehan Dep. Tr. 85:13-16).

57.     In June 2004, Plaintiff was transferred from his position as Dairy Clerk at Store #505 to Frozen Food Lead Clerk and receiver at Store #506 (Crehan Dep. Tr. 79:5-8, 106:22-107:3; Showalter Dep. Tr. 155:19-156:5; Walker Decl., Ex. H at 2).

58.     Hicks made the decision to transfer Plaintiff to Store #506 because the back room at Store #506 was in disarray and the store was having problems with the Computer-Assisted Ordering system (Hicks Dep. Tr. 205:4-12; Showalter Dep. Tr. 162:3-8; McCullough Dep. Tr. 170:9-171:7, 176:6-17).

10

59. Plaintiff was selected for the transfer because he was a floating employee in Store #505 without a set position, he lived conveniently between Store #505 and Store #506, and he had experience with receiving and Computer-Assisted Ordering. (Hicks Dep. Tr. 213:23-214:11; McCullough Dep. Tr. 171:8-13, 177:6-178:6).

60. Plaintiff admits that he had experience with and "knew everything" about working in a Frozen Food department prior to his transfer. (Crehan Dep. Tr. 38:23-39:18).

61. Plaintiff does not allege that he suffered a decrease in salary, benefits or hours following his transfer. (Compl. *passim*).

62. The basic duties and responsibilities of a Dairy Clerk and Frozen Food Clerk are similar in that both positions involve pushing and pulling pallets; cutting, marking and stocking product; monitoring and ordering inventory; and maintaining sanitary conditions in the store. (Hicks Decl., Ex. C).

63. As the Frozen Food Lead Clerk in Store #506, Plaintiff was responsible for managing the entire Frozen Food department. (Crehan Dep. Tr. 158:16-19; Hicks Dep. Tr. 215:22-216:6).

64. Plaintiff had not been managing any department at Store #505 prior to his transfer. (Hicks Dep. Tr. 215:22-216:6).

65. Plaintiff admits that after working in the Frozen Food department at Store #506 for only ten to fourteen days, he had eliminated the overstock that had been in the Frozen Food box prior to his transfer, and Hicks was pleased with his performance. (Crehan Dep. Tr. 107:21-110:13).

66. Hicks admits that the Frozen Food department at Store #506 improved under Plaintiff's direction. (Hicks Dep. Tr. 220:14-18).

67. Showalter admits that the Frozen Food department at Store #506 improved under Plaintiff's direction, and that Plaintiff's assistance was valued because he understood the new Computer-Assisted Ordering system. (Showalter Dep. Tr. 165:7-22).

68. Plaintiff admits that in addition to managing the Frozen Food department at Store #506, he also assisted as a store receiver. (Walker Decl., Ex. H at 2).

69. Stop & Shop Stores #505 and #506 are both in Brooklyn, New York and are only a few miles apart. (Crehan Dep. Tr. 89:17-25).

70. Stop & Shop Stores #505 and #506 are both "superstores," meaning they had more departments than a conventional Stop & Shop supermarket (Hicks Dep. Tr. 30:23-24; Showalter Dep. Tr. 16:7-23; McCullough Dep. Tr. 16:25-17:11, 60:9-15).

71. Plaintiff admits that at the time he was transferred, Stop & Shop Store #505 and Store #506 were roughly equidistant from his residence in Brooklyn, New York and his commuting time to both stores was roughly the same. (Crehan Dep. Tr. 90:5-24).

72. Plaintiff admitted that at the time he was transferred from Beverly, Massachusetts to Brooklyn, New York, he was familiar with the neighborhoods in Brooklyn and would not have objected had he been assigned to Store #506 rather than Store #505. Plaintiff testified:

> Q. You're originally from Brooklyn, though, aren't you?
>
> A. Yes.
>
> Q. You know neighborhoods of Brooklyn; correct?
>
> A. Yes.
>
>                 \*      \*      \*
>
> Q. In other words, had you been offered a position in Store 506 first, rather than 505 first, you wouldn't have had any objection, would you?

>           A.   The -- Boston never offered a store to me. Brooklyn informed me that I was transferred to Store 505.
>
>           Q.   Okay. That wasn't my question. My question was: Regardless of who told you you were going to 505, assuming it was 506, my hypothetical is, let's assume you were first told by Brooklyn, We'll take you, we want you to go to Store 506, Flatbush Avenue.
>
>           A.   Would I have objected?
>
>           Q.   Yes.
>
>           A.   No.
>
>           Q.   You would have accepted the position; correct?
>
>           A.   Correct.
>
>           Q.   You would have relocated; correct?
>
>           A.   Correct.

(Crehan Dep. Tr. 73:7-74:17, <u>but see</u> the Crehan errata sheet attached to Exhibit B of the Walker Decl.).

   73.   Plaintiff does not allege that he ever grieved his transfer from Store #505 to Store #506 to his Union. (Compl. *passim*).

**V.   Plaintiff Was Never Passed Over For A Promotion**

   74.   Plaintiff has not alleged that he was qualified for a promotion to Grocery Manager. (Compl. *passim*).

   75.   Plaintiff has not alleged that there ever was a vacancy for the Grocery Manager position in Store #505 during the entire time that he worked for Store #505 or Store #506. (Compl. *passim*).

   76.   Plaintiff admits that he does not know whether there were other candidates for the anticipated Grocery Manager position in Store #505. (Crehan Dep. Tr. 87:3-21).

13

77. Plaintiff admits that there was not an opening in the Grocery Manager position at Store #505 at the time that he was transferred from Store #505 to Store #506, but that there was only anticipation of such an opening.  (Crehan Dep. Tr. 88:10-23).

78. Hicks did not believe Plaintiff was qualified for promotion to Grocery Manager at Stop & Shop.  (Hicks Dep. Tr. 329:11-14, 330:15-331:10).

79. Hicks believed that Plaintiff had never held a leadership position with Stop & Shop.  (Hicks Dep. Tr. 330:15-21).

80. Hicks testified that the typical progression of a Stop & Shop employee to Grocery Manager was from "a clerk first in a department . . . to a Frozen Food manager, to a Dairy manager, to a Grocery manager."  (Hicks Dep. Tr. 330:15-25).

81. Hicks testified that Plaintiff's transfer to Store #506 as a Frozen Food manager was his "first step into leadership."  (Hicks Dep. Tr. 331:2-5).

82. Hicks offered Plaintiff a promotion to Dairy Manager in Little Neck, Queens, but Plaintiff declined the promotion. (Hicks Dep. Tr. 333:3-14).

83. There was never a vacancy in the Grocery Manager position in Store #505 in the entire time that Plaintiff was employed in Store #505 and Store #506.  (Hicks Decl. ¶ 6).

84. Plaintiff does not allege that he ever grieved his failure to be promoted to Grocery Manager in Store #505 to his Union.  (Compl. *passim*).

**VI.   Plaintiff Was Terminated For Deliberately Discarding Saleable Merchandise**

85. On March 2, 2005, Store #506 conducted its biannual inventory of store product. (Hicks Dep. Tr. 81:8-9; Showalter Dep. Tr. 144:2-4).

86. Stop & Shop typically brings in people from other stores to help prepare for the biannual inventories of Stop & Shop stores.  (Hicks Dep. Tr. 259:24-260:3).

14

87. The term "receiver" refers to a Stop & Shop employee responsible for receiving and scanning product from Stop & Shop vendors and for reclaiming merchandise. (Hicks Decl. ¶ 7; Hicks Dep. Tr. 158:20-22).

88. The term "reclamation" refers to the process whereby stores can recover dollars for certain damaged or discontinued items. The reclamation process involves segregating reclaimable product from non-reclaimable product. (Crehan Dep. Tr., Ex. 11 at 1).

89. To assist with the inventory scheduled for March 2, 2005, Hicks transferred Melvin Hernandez, another Stop & Shop employee, to Store #506 to work as a receiver in the back room and to assist with cleaning up the reclamation area. (Hicks Dep. Tr. 252:8-17; Crehan Dep. Tr. 167:3-10; Transcript of the Deposition of Melvin Hernandez ("Hernandez Dep. Tr.") 31:24-32:7 (the relevant portions of the transcript of Hernandez's deposition are annexed as Exhibit I to the Walker Decl.))

90. Plaintiff assisted with receiving and reclamation in preparation for the scheduled inventory. (Crehan Dep. Tr. 158:24-159:6).

91. Plaintiff was familiar with Stop & Shop's reclamation policies. (Crehan Dep. Tr. 155:19-23).

92. Stop & Shop's reclamation procedures require that all product be scanned, even if it is not saleable. (Showalter Dep. Tr. 135:8-17; McCullough Dep. Tr. 152:2-11).

93. Showalter and McCullough required management approval before any store product could be discarded by a Stop & Shop employee. (Showalter Dep. Tr. 134:3-13; McCullough Dep. Tr. 152:2-153:6).

94. On March 2, 2005, Plaintiff discarded company product while he was receiving in the back room at Store #506. (Compl. ¶ 24; Hicks Dep. Tr. 237:20-22).

15

95. Plaintiff's misconduct was called to Hicks' attention after Raphaellow Francis, the former Grocer Manager of Store #506, notified Showalter that he thought Plaintiff had discarded store merchandise during the inventory. (Hicks Decl. ¶ 8; Hicks Dep. Tr. 254:8-255:1; Showalter Dep. Tr. 185:8-14).

96. As Grocery Manager of Store #506, Francis, like Crehan, was a Union employee and not a member of the store management team. (Hicks Dep. Tr. 247:5-11).

97. Upon reviewing a surveillance video from that day, Hicks determined that Plaintiff had discarded numerous cases of unsorted and unscanned reclamation, saleable product and product marked for inventory at an estimated retail value of between six and eight thousand dollars. (Hicks Decl. ¶ 9).

98. Stop & Shop's Human Resources department conducted an investigation into Plaintiff's misconduct, as well as the related misconduct of other employees who had knowledge of Plaintiff's actions. (Hicks Decl. ¶ 9).

99. The investigation included multiple interviews with employees who had knowledge of the events of March 2, 2005, including Crehan; Showalter; Melvin Hernandez, a clerk assigned to assist Crehan with sorting the store's reclamation; Raphaellow Francis, the Grocery Manager at Store #506; James Hall, the Customer Service Manager at Store #506; and Joe Dacunha, the Non-Perishable Manager at Store #506. (Hicks Decl. ¶ 10; Hicks Dep. Tr. 244:16-18, 254:8-255:1, 275:20-276:8, 293:9-23, 295:4-11).

100. The employees' union, Local 1500 of the United Food and Commercial Workers International Union, AFL-CIO, represented Crehan, Melvin Hernandez and Raphaellow Francis in connection with this investigation. (Hicks Decl. ¶ 10).

NY1 26431889.9 / 24253-000114

101. During the course of the investigation, Joe Dacunha, a non-union manager, admitted that he was aware that Crehan had discarded saleable product and that he exercised poor judgment in failing to stop Crehan from discarding merchandise and immediately reporting Crehan to more senior management. (Hicks Decl. ¶ 11; Hicks Dep. Tr. 250:10-251:2).

102. During the course of the investigation, Melvin Hernandez also admitted that he observed Crehan discarding saleable product. (Hicks Decl. ¶ 11; Hernandez Dep. Tr. 46:17-19).

103. Plaintiff was suspended pending termination and ultimately terminated for discarding saleable product without authorization from management. (Hicks Dep. Tr. 237:20-22, 238:20-23).

104. The decision to terminate Plaintiff was made jointly by, among others, Hicks, Showalter, and members of Stop & Shop's Human Resources department. (Hicks Dep. Tr. 232:18-233:5).

105. Joe Dacunha, the Non-Perishable Manager at Store #506 on March 2, 2005, was also terminated in connection with the discarding of company product by Plaintiff that took place on that day. Dacunha was not a participant in the Jacobsen action. (Hicks Dep. Tr. 250:5-12, 246:14-23; Walker Decl. Ex. C).

106. Melvin Hernandez, a union member who did not join the Jacobsen action, was suspended and terminated in connection with the discarding of company product by Plaintiff on March 2, 2005, but was ultimately reinstated two to three months later pursuant to an agreement with Hernandez' Union. (Hicks Dep. Tr. 261:18-262:9; Hernandez Dep. Tr. 58:4-8, 66:2-6; Walker Decl. ¶ Ex. C).

107. Raphaellow Francis, a union member and Grocery Manager at Store #506 on March 2, 2005, was suspended pending termination and ultimately demoted to a full-time clerk

in connection with the discarding of company product by Plaintiff.  Francis was not a participant in the <u>Jacobsen</u> action.  (Hicks Dep. Tr. 247:5-7; 248:21-22; 295:19-25; Walker Decl. Ex. C).

108.  Hicks testified that James Hall, Customer Service Manager at Store #506 on March 2, 2005, was demoted in connection with the discarding of company product by Plaintiff.  Hall was not a participant in the <u>Jacobsen</u> action (Hicks Dep. Tr. 296:22-298:3; Walker Decl. Ex. C).

**VII.  Plaintiff Does Not Allege That His Union Breached Its Duty Of Fair Representation**

109.  The collective bargaining agreement expressly sets forth a three-step grievance and arbitration procedure governing all disputes "arising out of interpretation, application, breach or claim of breach of the provisions of [the] Agreement." (Hicks Decl., Ex. A at 31).

110.  Under the collective bargaining agreement, an employer has the right to suspend an employee pending discharge an employee for just cause, and the Union has the option of grieving the discharge.  If the matter is not settled through the grievance procedure, then either party has the option of submitting the matter to binding arbitration.  (Hicks Decl., Ex. A at 38).

111.  Plaintiff grieved his discharge to the Union in accordance with the collective bargaining agreement, and that the parties met in an effort to adjust the grievance.  (Compl. ¶¶ 25-26).

112.  Plaintiff does not allege that the Union breached its duty of fair representation to him in its processing of his grievance with Stop & Shop.  (Compl. *passim*).

**VIII.  Plaintiff Failed To File His Claim For Breach Of The Collective Bargaining Agreement Within The Applicable Six-Month Statute Of Limitations**

113.  Plaintiff admits that sometime before April 2, 2005, the Union provided him with final notification that his employment with Stop & Shop had been terminated and that his

grievance would not be submitted to arbitration.  This was the final telephone call that Plaintiff had with the Union on this matter.  (Crehan Dep. Tr. 148:9-24, 199:25-200:20).

**IX.     Stop & Shop Is Not The Plan Administrator Of The Plan**

114.    The Plan is a multi-employer plan operating under the provisions of ERISA and covers "[a]ll full-time employees covered under the Collective Bargaining Agreements of contributing employers with U.F.C.W. Local 1500, AFL-CIO, and for whom the employer makes a contribution to the Fund."  (Hicks Decl., Ex. B at 6, 95-99).

115.    Stop & Shop is a contributing employer to the UFCW Local 1500 Welfare Fund. (Walker Decl., Ex. A at 33).

116.    The Plan Administrator of the Plan is the Board of Trustees of the Local 1500 Welfare Fund (the "Trustees"), not Stop & Shop. (Hicks Decl., Ex. B at 96).

117.    Pursuant to the collective bargaining agreement, "[t]he Trustees have assumed all responsibility for the administration of the Plans, and the employer [Stop & Shop] shall have no responsibility, except as herein provided."  (Hicks Decl., Ex. A at 36).

118.    As the Plan Administrator, the Trustees were responsible for notifying Plaintiff of his COBRA rights.  (Hicks Decl., Ex. A at 36; Ex. B at 93, 96).

119.    Stop & Shop notified the Fund of Plaintiff's termination on or about April 13, 2005, less than thirty (30) days after the loss of Plaintiff's benefits coverage on March 31, 2005. (Declaration of Patricia A. Loring, dated September 12, 2006 ¶ 3).

Dated: New York, New York
September 12, 2006

                          SEYFARTH SHAW LLP

                          By:  /s Christopher H. Lowe
                               Peter A. Walker (PW-7984)
                               Christopher H. Lowe (CL-0218)
                               Jacquelyn G. Holscher
                        1270 Avenue of the Americas, Suite 2500
                        New York, New York 10020-1801
                        (212) 218-5500

                        Attorneys for Defendant
                        The Stop & Shop Supermarket Company LLC

NY1 26431889.9 / 24253-000114